**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MYRON HARLSTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14-cv-1606** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Mason** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant, Myron Harlston ("Harlston" or "claimant"), has brought a motion for summary judgment [16] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Harlston's claim for Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") under Sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. (R. 22.) The Commissioner filed a cross-motion for summary judgment asking the court to uphold the decision of the Administrative Law Judge ("ALJ") [27]. The Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g) and 1383(c). For the reasons set forth below, Harlston's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied.

## I. BACKGROUND

### A. Procedural History

Harlston filed applications for DIB and SSI on May 3, 2011.  (R. 174-82.)
In both applications he alleged a disability onset date of May 5, 2010.  (*Id.*)  Both
claims were initially denied on August 15, 2011.  (R. 77-86.)  After a timely
request for reconsideration, Harlston's claims were again denied on December
16, 2011.  (R. 89-91.)  Thereafter, the claimant requested a hearing, which was
held on September 28, 2012 before ALJ Jose Anglada.  (R. 41, 47-76.)  On
October 26, 2012, the ALJ issued a written decision denying Harlston's request
for benefits.  (R. 19-36.)  Harlston filed a timely request for review, which the
Appeals Council denied on January 13, 2014. (R. 1-3, 18.)  The ALJ's decision
became the final decision of the Commissioner.  *Estok v. Apfel*, 152 F.3d 636,
637 (7th Cir. 1998); 20 C.F.R. § 416.1481.  Harlston subsequently filed this
action in the District Court.

### B.  Medical Evidence

#### 1.  Treating Physicians

On April 25, 2010, Harlston presented to Stroger Hospital's emergency
room for knee and back pain that he described as 10/10 on the pain scale.  (R.
250-53.)  The examining physician ordered x-rays and diagnosed moderate
tricompartmental osteoarthritis and a small joint effusion in his left knee with no
acute fracture or dislocation.  (R. 250.)  The lumbosacral spine x-ray revealed
severe endplate sclerosis in the lower lumbar spine with moderate sized anterior
marginal osteophytes and decreased intervertebral disc space.  (R. 252.)  The

findings reflected degenerative disc disease, with the most pronounced degeneration at L4/L5 and L5/S1. (*Id.*)

Almost a year later, on March 4, 2011, Harlston returned to Stroger Hospital complaining of chronic lower back pain that had worsened over the past week. (R. 241.) The physician's notes indicate Harlston experienced "crushing" pain that occasionally radiated past his thighs. (*Id.*) Harlston reported taking Ibuprofen for the pain. (*Id.*) Upon examination, the physician determined that there was no swelling in his back and that his gait was normal. (*Id.*) Another lumbosacral spine x-ray was ordered and, again, identified multilevel degenerative disk disease, most pronounced at L4/5 and L5/S1. (R. 243.) Harlston's degenerative disk disease was found to have remained stable since his previous visit to Stroger. (*Id.*) The physician also confirmed endplate sclerosis and osteophyte formation as well as facet joint arthropathy from the x-rays. (*Id.*) He was given an IV injection for the pain and was reported to be ambulating well afterwards. (R. 242.) It was reported that he wanted to leave before a reassessment of his pain. (*Id.*)

Harlston subsequently sought treatment for hypertension, back, and knee pain from Dr. Mykela Loury at Miles Square Health Center on April 1, 2011. (R. 259.) He explained that he began experiencing back pain about one year prior to the visit and that it had become increasingly painful over the past three months. (*Id.*) He rated his level of pain at 10/10 on the pain scale. (R. 260.) He told Dr. Loury that he took over-the-counter pain medications, including Ibuprofen, to

manage his condition.  (R. 259.)  He also mentioned that his knee occasionally "pops," causing pain.  (*Id.*)

Dr. Loury performed a physical examination.  (R. 260.)  Harlston measured 6 feet 4 inches and weighed 405 pounds, with a BMI of 49.41.  (*Id.*)  His blood pressure was 144/104, but Dr. Loury noted that Harlston had not been taking his hypertension medication as directed.  (R. 259-60.)  He had a normal range of motion, normal strength, no swelling, and a normal gait.  (R. 261.)  He had no paraspinous process tenderness and exhibited a positive straight leg raise.  (*Id.*)  Dr. Loury prescribed a trial of Hydrochlorothiazide and Tramadol and instructed him to follow up as needed.  (*Id.*)

Harlston returned to Miles Square Health Center for a follow up on April 26, 2011.  (R. 255.)  He reported that he had been watching his diet and had lost eleven pounds.  (R. 255-56.)  He complied with his hypertension medication as directed and lowered his blood pressure to 126/86.  (R. 256.)  He reported no pain while sitting but complained of the same 10/10 back pain with movement.  (R. 255.)  He stated that he did not get relief from one tablet of Tramadol.  (R. 255.)  Dr. Loury increased the Tramadol and referred Harlston to physical therapy.  (R. 257.)

On July 15, 2011, Harlston underwent an MRI of his lumbar spine.  (R. 262.)  According to the reviewing radiologist, it revealed mild straightening of normal lumbar lordosis and diffuse low T1 signal intensity involving the vertebrae, suggesting physiologic red marrow reconversion.  (*Id.*)  The radiologist concluded that anterior marginal osteophytes involving the vertebral endplates of L2 through

L5 confirmed degenerative disc disease and degenerative facet arthropathy.  (R. *Id.*)  Additionally, he was diagnosed with diffuse posterior disc bulge without spinal canal or neuroforamina stenosis at L2/L3 and circumferential disc bulge without spinal canal stenosis at L3/L4, L4/L5, and L5/S1 from the MRI results. (R. 262-63.)

Harlston went to his first physical therapy appointment on July 18, 2011. (R. 317.)  At his examination, he continued to describe his level of pain as 10/10. (*Id.*)  He explained that he could not stand for very long and was unable to walk a block.  (*Id.*)  He complained of problems sleeping and told the therapist that he took Ibuprofen to manage the pain and help him sleep.  (*Id.*)  The physical therapist found that Harlston had very tight quadriceps and reduced range of motion.  (*Id.*)  He was instructed on an exercise program that included applying heat to the knees and back, riding a stationary bicycle, and stretching.  (*Id.*)

Harlston returned to physical therapy on July 21 and August 25, 2011.  (R. 314-15.)  He tolerated the exercise program on both occasions well and was instructed to continue with treatment.  (*Id.*)  However, on September 8, 2011, the clinic discharged Harlston from the physical therapy program for failing to call or show up to treatment.  (R. 316.)

Harlston continued his follow up visits with Dr. Loury at Mile Square Health Center.  On August 19, 2011, he returned seeking refills on his prescriptions.  (R. 297.)  He mentioned being out of his blood pressure and pain medications for two weeks, though Dr. Loury noted that he had been given five refills.  (*Id.*) Harlston reported that his pain was lower when sitting, but that moving,

especially walking, was difficult.  (*Id.*)  He also informed Dr. Loury that two tablets of Tramadol were not providing him with relief.  (*Id.*)  His weight was down to 386 pounds and his BMI was 47.10.  (R. 298.)  Dr. Loury found positive TTP and mild paraspinal tenderness at the region of the L-3 and L-4 but no TTP of the cervical spine.  (*Id.*)  Harlston's blood pressure was elevated, which could be explained by him not taking his blood pressure medication.  (*Id.*)  Dr. Loury was unable to get his MRI results over the phone.  (*Id.*)  He instructed Harlston to personally obtain the records and bring them to Mile Square Health Center.  (*Id.*)  He also gave Harlston a trial of Nabumetone, along with prescriptions of Hydrochlorothiazide and Tramadol.  (R. 297-98.)

Harlston's next visit to Dr. Loury was October 7, 2011.  (R. 294.)  This was a scheduled follow up to review the MRI, but Harlston did not have the MRI results as requested.  (*Id.*)  The clinic provided a letter to Harlston and a release of medical records form so that he could go back the following day to retrieve his MRI results.  (R. 295.)  At his examination, Harlston complained of continuing back pain and stiffness.  (R. 294.)  He mentioned that his legs were also locking up.  (*Id.*)  As before, the pain was greatest on movement, especially walking. (*Id.*)  Harlston also experienced pain after sitting for a long time.  (*Id.*)  He reiterated that two tablets of Tramadol were ineffective.  (*Id.*)  The Nabumetone helped him at night but caused drowsiness.  (*Id.*)  He told Dr. Loury that he had started physical therapy and went twice weekly for six weeks, but had not been in the last month because he did not have money to ride the bus.  (*Id.*)  Dr. Loury instructed him to continue taking Nabumetone and prescribed Tylenol #3 for

severe pain. (R. 295.) He also recommended Harlston return to physical therapy. (*Id.*)

On November 18, 2011, Harlston returned to Mile Square Health Center for another scheduled follow up with Dr. Loury. (R. 300.) This time he brought his MRI results. (*Id.*) Dr. Loury reviewed the MRI results from Stroger Hospital and diagnosed multiple herniated discs causing back pain. (R. 301.) Harlston continued to complain of back pain and stiffness, which was exacerbated with movement. (R. 300.) He reported minimal relief from taking Nabumetone and stated that he was unable to fill the prescription for Tylenol #3 because he did not have enough money. (*Id.*) He also explained that he still could not afford to take the bus to physical therapy and did not have any other reliable transportation. (*Id.*) He mentioned feeling depressed due to his inability to work. (*Id.*) Dr. Loury referred Harlston to a neurosurgeon and instructed him to continue taking Nabumetone and Tylenol #3 as directed. (R. 301.) Dr. Loury again encouraged him to return to physical therapy. (*Id.*)

Also on November 18, 2011, Dr. Loury completed a physical residual functional capacity questionnaire, in which he diagnosed Harlston with hypertension and stated several opinions regarding the severity of Harlston's condition and the effect on his ability to work. (R. 306-08.) Dr. Loury opined that Harlston would not be able to walk a city block without rest or severe pain. (R. 306.) He estimated that Harlston would be limited to sitting, standing, and walking for a total of two hours in an eight hour workday. (R. 307.) He suggested that Harlston would need to be able to walk around every ninety

minutes for twenty minutes during an eight hour workday and that he required a cane. (*Id.*) Dr. Loury also stated that Harlston could stand for ten minutes at a time before needing to sit down and could sit for a total of thirty minutes before needing to get up. (R. 306.)

Harlston's next visit to Dr. Loury was nearly six months later, on May 14, 2012. (R. 321.) Harlston stated that he had not heard from Stroger's neurosurgery department and that he had not been to physical therapy for three or four months because of transportation difficulties. (R. 321.) He also informed Dr. Loury that Tylenol #3 did not help and that the other pain medications were ineffective as well. (R. 321.) Harlston's weight was up to 403 and his BMI was 49.09. (R. 321.) Dr. Loury gave Harlston a trial of Tramadol and a referral to University of Illinois Medical Center at Chicago ("UIC") neurosurgery. (R. 322.)

On May 30, 2012, Harlston saw Dr. Herbert Engelhard at UIC. (R. 338.) Harlston told Dr. Engelhard that the low back and leg pain began in April 2011. (*Id.*) He mentioned that the pain was worst when walking and only tolerable while sleeping. (*Id.*) Harlston said that physical therapy aggravated his condition, and the various prescription and over-the-counter pain medications did not help. (*Id.*) At his examination he weighed 404 pounds and his blood pressure was 125/83. (R. 339.) He had some distal weakness in his lower extremities and difficulty walking. (*Id.*) Dr. Engelhard noted that Harlston used a cane, which helped support his back. (*Id.*) Dr. Engelhard also found a markedly antalgic gait and very significant paraspinal muscle spasm. (*Id.*) Harlston was diagnosed with severe lumbar degenerative disk disease and facet arthropathy

predominantly at L2-L3, L3-L4, and L4-L5.  (*Id.*)  Dr. Engelhard prescribed Neurontin and ordered a back brace and lumbar TENS unit to help relieve Harlston's pain.  (*Id.*)

Harlston missed an appointment with pain specialist, Dr. Effossyni Votta-Velis at UIC on June 19, 2012.  (R. 334).  On July 17, 2012, Harlston was treated by Dr. Linda Lee and Dr. Votta-Velis and complained of lower back pain radiating to his lower extremities and numbness in his feet.  (R. 332.)  He characterized his pain as 10/10 and stated that it worsened while walking and in cold or rainy weather.  (*Id.*)  He also told them that the Gabapentin prescribed by Dr. Engelhard had not helped.[1]  (*Id.*) The back brace and TENS unit that were prescribed by Dr. Engelhard only mildly alleviated his pain.  (R. 332.)

On examination, Harlston showed no increased pain with flexion of the back, no focal point tenderness in the lumbar region, and mild pain with rotation of the spine.  (*Id.*)  His strength was 5/5 bilaterally in the lower extremities.  (*Id.*) Dr. Lee found him to have a history of obesity and multi-level disc disease presenting with lower back pain with radiculopathy.  (R. 333.)  She prescribed Diclofenac-Misoprostol and continued him on Gabapentin.  (*Id.*)  He was referred back to physical therapy and advised to follow up with his primary care physician to get clearance for a steroid injection.  (*Id.*)  Dr. Votta-Velis concurred with Dr. Lee's assessment, further noting that there were no apparent barriers to Harlston's understanding of their explanations.  (*Id.*)

---

[1] The only visit with Dr. Engelhard in the record was on May 30, 2012 and there is no indication in his notes that Dr. Engelhard prescribed Gabapentin.  (R. 338-39.)

## 2. Agency Consultants

Disability Determination Services ordered Harlston to undergo a psychiatric examination on July 25, 2011.  (R. 264.)  Harlston showed up late to the appointment and was at first unsure why a psychiatric interview had been scheduled.  (*Id.*)  Dr. Henry Fine spent forty-five minutes with Harlston.  (*Id.*)  Harlston eventually stated that he felt "down" as the result of his medical issues and inability to work.  (*Id.*)  He also described sleeping poorly and becoming more forgetful lately.  (*Id.*)  At one point during the examination, Harlston mentioned that he had forgotten his medications on the bus ride to the appointment.  (*Id.*)  Based on his mental status evaluation, Dr. Fine concluded that Harlston had a severe learning disability, such that he would have problems getting around.  (R. 266.)  He also presented with immediate memory deficits, poor fund of information, problems calculating, problems abstracting, and problems with judgment.  (R. 267.)

Kirk Boyenga, Ph.D., completed a psychiatric review technique assessment and mental residual functional capacity assessment on August 9, 2011.  (R. 268-85.)  Dr. Boyenga determined that Harlston suffered from a learning disorder, which restricted his daily activities.  (R. 269-78.)  He also noted that Harlston had moderate difficulty understanding and remembering detailed instructions and difficulty maintaining attention and concentration for extended periods.  (R. 282.)  Harlston was found to be moderately limited in completing a normal workday and workweek without interruptions from psychologically based

symptoms and would have trouble responding appropriately to changes in his work setting. (R. 283.)

On August 12, 2011, Dr. B. Rock Oh completed a physical residual functional capacity assessment of Harlston. (R. 286-293.) Dr. Oh determined that Harlston could occasionally lift twenty pounds and frequently lift ten pounds. (R. 287.) Dr. Oh also opined that Harlston could stand or walk with normal breaks for about six hours in an eight hour workday, could sit for about six hours in an eight hour workday, and had unlimited ability in his upper extremities, including manipulating with his fingers. (R. 288-89.) Finally, Dr. Oh determined that he had no visual, communicative, or environmental limitations. (R. 289-90.)

### C. Claimant's Testimony

At the time of the September 28, 2012 hearing, Harlston was 48 years old, divorced, and living alone. (R. 50-51.) His highest level of education was eleventh grade. (R. 52.) He lived in Section 8 housing and received food stamps. He previously worked in construction, including drywall, plastering, painting, demolition, and general labor. (R. 52-53.) He testified that his last construction job was in 2002 or 2003. (R. 55.) He subsequently worked in security and various temporary work; and he testified that his last employment of any kind was sometime in 2010 or 2011. (*Id.*)

Harlston could not pinpoint exactly how he injured his back. (R. 56.) He testified that it happened sometime in 2011. (*Id.*) He initially surmised that it happened while working on a truck delivering liquor, but also noted that it could have happened due to a fall in his bathtub. (*Id.*) He was not certain because he

took pain medication after the fall and the pain subsided for a week. (*Id.*) Since his injury, Harlston claimed to have gained one hundred pounds. (R. 66.) He stated that he wore a back brace, used a TENS unit, and took medications for pain as well as high blood pressure. (R. 56-57.) He claimed to get little relief from the various pain medications he had been taking for the past year and that his current medications made him drowsy. (R. 57-58.) He testified that he was not a candidate for surgery and that physicians would not give him epidural shots for the pain because of his high blood pressure. (R. 56-57.) Harlston also stated that he attended physical therapy, but that it was not helpful and actually aggravated his condition. (R. 59.) He had not undergone psychiatric treatment but testified that he would be willing to go if it were referred. (R. 61.)

He testified to having difficulty with daily tasks. (R. 61-63). He was able to carry ten to fifteen pounds, but not for long periods. (R. 62.) His kids and friends helped him with getting groceries. (*Id.*) He was able to cook for himself, but it took him two or three times longer because of his inability to stand for more than five or ten minutes. (R. 61-62.) Other household chores like cleaning the floors and doing laundry were also difficult. (R. 62.) He stated that he had to frequently start and stop when performing chores due to discomfort. (*Id.*)

Harlston testified that walking was a challenge for him. (R. 62-63.) He used a cane to walk and testified that he could walk no more than half a block before having to stop to sit down or lean on something. (R. 62.) The cane was not prescribed by a physician. (*Id.*) He also stated that it was hard for him to get out of bed to use the bathroom because his whole body became stiff while

sleeping.  (R. 64.)  His sleep schedule was erratic, and he often slept for two or three hours after taking his pain medication but then woke up and could not get back to sleep.  (*Id.*)

Harlston stated that he wore the back brace all the time.  (R. 66.)  He used the TENS unit between eight to twelve hours per day.  (*Id.*)  He mentioned that he took pain medication, elevated his legs, and used ice and heating pads for his condition.  (R. 68.)  He believed that his weight affected his pain level, particularly his ability to move around.  (R. 66-67.)  He also described the pain as traveling down his legs and causing numbness and tingling.  (R. 67.)  Additionally, he suffered from knee pain and swelling.  (*Id.*)  Harlston also testified that he forgot certain things when performing daily tasks and had difficulty concentrating when watching television.  (R. 68.)  He did not think he could work because of his pain and difficulty concentrating. (R. 68-69.)

When asked if he did anything for fun Harlston testified that he enjoyed television and music.  (R. 65.)  He liked watching sports and attended sporting events sometimes.  (*Id.*)  He stated that had been to a Chicago White Sox baseball game and Chicago Bulls basketball game recently.  (*Id.*)

### D.  Vocational Expert's Testimony

Margaret Ford, a vocational expert ("VE"), also testified at the hearing.  (R. 69-76.)  The VE testified that Harlston's relevant work history was construction. (R. 70.)  VE Ford classified Harlston as a semi-skilled, category 4 construction worker.  (*Id.*)

The ALJ first asked the VE to determine if a hypothetical individual with the same limited education and past relevant work experience as Harlston, who can lift and carry twenty pounds occasionally and ten pounds frequently, and needs to alternate between sitting and standing throughout the workday, would be able to perform Harlston's past jobs in construction. (R. 71.) VE Ford opined that such an individual would not be able to return to construction work, but could perform light work such as ticket seller, assembler, and inspector. (R. 71-72.) The VE stated that there were 43,340 existing ticket seller positions, 13,060 existing assembler positions, and 5,270 existing inspector positions in the State of Illinois. (*Id.*)

The ALJ next asked whether needing a cane to ambulate would prohibit Harlston from doing those jobs. (R. 72.) The VE responded that those positions do not require walking, and as long as he could get to his workstation the cane would not be an issue. (*Id.*)

The ALJ next asked about the on-task time requirements for performance of the jobs. (*Id.*) The VE stated that Harlston must be able to remain on task ninety percent of the day. (*Id.*) Finally, the ALJ asked about the tolerated absenteeism. (*Id.*) The VE responded that one unexcused absence per month would be tolerated. (*Id.*) However, the VE stated that it is encouraged not to have any absences in the first ninety days of employment. (R. 73.)

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial

evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart,* 290

F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of

evidence and is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.

1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28

L.Ed.2d 842 (1971)).  We must consider the entire administrative record, but will

not "re-weigh evidence, resolve conflicts, decide questions of credibility, or

substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart,*

336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel,* 227 F.3d 863, 869 (7th

Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not

let the Commissioner's decision stand "if it lacks evidentiary support or an

adequate discussion of the issues."  *Lopez,* 336 F.3d at 539 (quoting *Steele,* 290

F.3d at 940).

In addition, while the ALJ "is not required to address every piece of

evidence," he "must build an accurate and logical bridge from the evidence to

[his] conclusion."  *Clifford,* 227 F.3d at 872. The ALJ must "sufficiently articulate

[his] assessment of the evidence to assure us that the ALJ considered the

important evidence ... [and to enable] us to trace the path of the ALJ's

reasoning."  *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam)

(quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985)).

### B.  Analysis under the Social Security Act

In order to qualify for disability insurance benefits or supplemental security

income, a claimant must be "disabled" under the Social Security Act (the "Act").

A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski,* 245 F.3d at 885–86.  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis.  At step one, the ALJ found that Harlston had not engaged in substantial gainful activity since May 5, 2010, the alleged onset of disability.  (R. 24.)  At step two, the ALJ found that the claimant's multi-level degenerative disc disease of the back and obesity were severe impairments.  (*Id.*)  He found claimant's hypertension to be largely controlled with medication compliance and therefore non-severe.  (*Id.*)  Additionally, the ALJ determined that Harlston's mental impairments did not cause more than minimal limitation in his ability to perform basic mental work activities.  (R. 25.)  At step

three, the ALJ found that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 26.) At step four, the ALJ found that Harlston had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). (R. 27.) Specifically, the ALJ found that he had the ability to lift and carry twenty pounds occasionally and ten pounds frequently, and to be on his feet standing and walking for approximately six hours in an eight hour workday and sit for approximately six hours, with normal rest periods. (*Id.*) He would need the option to alternate between sitting and standing. (*Id.*) The claimant would be expected to be off task for approximately five percent of the time in an eight hour workday. (*Id.*) The ALJ found the claimant unable to work at heights, climb ladders, or frequently negotiate stairs and could only occasionally crouch, kneel, or crawl. (*Id.*) The ALJ also determined that Harlston should avoid operating moving or dangerous machinery and that he is unable to perform past relevant work. (R. 27, 34.) At step five, the ALJ found that considering his age, education, work experience, and RFC, there were a significant number of jobs in the national economy that he could perform. (*Id.*) As a result, the ALJ found that the claimant has not been under a disability since May 5, 2010. (R. 35.)

Harlston argues that the ALJ failed to properly weigh the opinions of his treating physicians and psychiatrist. He contends that the ALJ failed to consider significant medical evidence in his favor and failed to give good reasons for rejecting the opinions of Harlston's treating physicians. Next, he argues that the

ALJ improperly determined Harlston's Residual Functional Capacity.  Harlston

contends that the ALJ erred by failing to give proper weight to his mental

limitations.  He also argues that the ALJ failed to find his bilateral knee condition

medically determinable and severe and failed to incorporate the effects of his

knee condition, obesity, and use of a cane into the RFC.  Finally, Harlston argues

that the ALJ's credibility determination was legally insufficient.

### C.  The ALJ Improperly Weighed the Medical Opinions Concerning Claimant's Alleged Disability.

Claimant argues that the ALJ committed reversible error when he failed to

properly weigh the opinions of Harlston's treating physicians, Dr. Loury and Dr.

Engelhard, while accepting the opinion of a non-examining physician, Dr. Oh.

Similarly, Harlston argues that the ALJ failed to give proper weight to Dr. Fine's

psychiatric examination findings and Dr. Boyenga's opinion, which relied on Dr.

Fine's findings.  The Commissioner asserts that the ALJ's finding was supported

by substantial evidence in the record.  We agree with the claimant.

A treating physician's opinion regarding the nature and severity of her

patient's impairments is generally entitled to great weight.  20 C.F.R. §

416.927(c)(2).  According to SSR 96-2p, the treating physician's opinion is

entitled to controlling weight when it is supported by medical findings and not

inconsistent with the evidence of record.  *See* 20 C.F.R. § 404.1527(c)(2).  The

non-examining, non-treating physician is less familiar with the other information

in the case record; accordingly, less weight is afforded to her.  *See* 20 C.F.R. §

404.1527(c)(6); *see also Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)

(finding that a contradictory opinion of a non-examining physician does not, by

itself, suffice as a reason for the ALJ's rejection of an examining physician's opinion).

The ALJ in this case accorded little weight to Dr. Loury's opinions, finding them to be inconsistent with treatment notes, "largely sympathetic" to Harlston, and based on "limited and infrequent" treatment. (R. 33.) The ALJ must, however, consider the evidence as a whole, which includes Dr. Loury's treatment for degenerative disc disease of the lumbar spine, degenerative joint disease of the knees, obesity, and hypertension. *See* 20 C.F.R. § 404.1527(c)(4) (requiring consideration whether medical opinions are consistent "with the record as a whole"). The ALJ cannot selectively consider various treatment notes from the record without taking all of the records into consideration. *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir. 2009); *see also Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) (explaining that the Court has "repeatedly forbidden" ALJs from cherry-picking only the medical evidence that supports their conclusion).

Here, Dr. Loury's medical records reference claimant's multiple herniated discs causing back pain, hypertension, knee pain, and obesity, conditions that are reinforced by other medical records. These conditions and limitations are further substantiated by the treatments prescribed by claimant's various treaters, that include prescription medication, physical therapy, TENS unit, a back brace, and a planned steroid injection. Accordingly, the ALJ failed to establish that Dr. Loury's assessment was inconsistent with the objective medical records.

The ALJ further discounted Dr. Loury's opinions due to Harlston's absenteeism and failure to comply with certain treatment plans. Notably, the

records indicate that Harlston was seen by Dr. Loury six times in a thirteen month period, which this Court does not find equates to "limited" treatment. Moreover, absenteeism and noncompliance are, in part, explained by claimant's financial difficulties and learning disability. The Seventh Circuit has held that the ALJ must first consider the reasons for lack of treatment before drawing a negative inference. *Craft v. Astrue,* 539 F.3d 668, 679 (7th Cir. 2008). Courts have also determined that the inability to afford treatment constitutes a good reason for not receiving it. *See, e.g. SSR 96-*7p, 1996 WL 374186, at * 8; *Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir. 2012). The ALJ, however, never properly considered claimant's statements that he could not afford certain medication at times and could not afford bus fare to go to physical therapy.

Next, Harlston argues that the ALJ improperly discounted the opinions of Dr. Engelhard. The ALJ discounted Dr. Engelhard's opinion that Harlston should definitely qualify for disability because that is a finding reserved for the Commissioner and not entitled to controlling weight. *See Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010). While this Court agrees that the Commissioner makes the determination regarding disability, Dr. Engelhard's assessment of the patient is nonetheless relevant. The ALJ also opined that Dr. Engelhard's opinions were based on Harlston's subjective complaints rather than objective evidence and discounted his findings because of the amount of time he spent examining Harlston[2]. Dr. Engelhard, however, reviewed the claimant's treatment records and MRI, and there is nothing to indicate that his findings were based

---

[2] Dr. Engelhard examined Harlston for about 15 minutes, and spent the additional 15 minutes discussing treatment.

only on subjective complaints. He rendered opinions consistent with the medical records in this case, finding that Harlston had "severe lumbar degenerative disc disease with chronic back and leg pain and weakness." (R. 339.)

Notably, even though the ALJ gave limited weight to Dr. Engelhard, he gave great weight to the opinion of Dr. Oh, a state agency examiner who did not treat Harlston and also never reviewed his MRI. Harlston argues that the ALJ erred by giving great weight to Dr. Oh's RFC assessment, in which he opined that Harlston remained capable of light work. Harlston argues that because Dr. Oh was a non-examining physician who did not review his MRI, knee x-rays, or Dr. Engelhard's report, his opinion should not suffice as evidence for the ALJ to reject the opinions of examining physicians. The Court agrees that the ALJ improperly gave greater weight to the opinion of a non-treating physician who did not see all of the objective evidence supporting Harlston's claim. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (finding that the ALJ erred in accepting consulting physician's conclusions where the consulting physician had not reviewed an MRI report, which was new and potentially decisive medical evidence).

The ALJ explained that it compensated for Dr. Oh's inability to review all available records by giving Harlston all reasonable benefits of the doubt regarding his large body habitus, use of a back brace, stiffness, numbness, and pain by providing additional postural limitations and off task time of five percent. The ALJ does not, however, explain how each specific limitation reasonably compensates for the fact that Dr. Oh did not review all of the medical records.

The ALJ cannot merely include certain limitations and off task time without providing a logical bridge as to how they remedy a state physician's failure to opine on the record as a whole. *See Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992) (ALJ improperly substituted his own medical opinion for that of claimant's treating physicians). There is no indication in the records that the ALJ's additional limitations fit the medical needs of the claimant and compensate for the records Dr. Oh did not review.

Finally, Harlston argues that the ALJ erred by giving limited weight to the findings of Dr. Fine and Dr. Boyenga regarding his mental health impairments. He claims that the ALJ failed to consider the qualifications of Dr. Fine and Dr. Boyenga when discounting their opinions. An ALJ must consider the specialization of the state agency physician in determining the weight to be given to the opinion. SSR 96-6p; 20 C.F.R. § 404.1527(c)(5).

The ALJ rejected Dr. Fine's conclusion that Harlston had a severe learning disability because it was inconsistent with the objective evidence. (R. 25, 32.) The ALJ also discounted Dr. Boyenga's opinion because it relied heavily upon Dr. Fine's opinion. As an example of a record discrepancy, the ALJ noted that Dr. Loury's treatment notes stated that Harlston understood the medical information discussed, including his diagnosis and the recommended treatment. (R. 257-58.) To this Court's knowledge, Dr. Loury is not a psychiatrist and was never asked to provide an assessment of claimant's mental health. Aside from the state agency reviews, there is no indication Harlston ever sought mental health treatment. While the Court agrees that the treating physicians' medical

records do not demonstrate severe learning disabilities or mental impairment, the record as a whole includes the assessments of Dr. Fine and Dr. Boyenga and should be considered. There is no mental health assessment within the record that conflicts with the opinions of Drs. Fine and Boyenga. Notably, while the ALJ's review of Drs. Fine and Boyenga's assessments do not warrant remand independent of the other arguments addressed here, the ALJ should nonetheless consider the opinions on remand.

For these reasons, the Court finds that the ALJ erred in weighing the medical opinions concerning Harlston's alleged disability and remands this matter to the ALJ for review consistent with this Court's finding.

### D. The ALJ Did Not Properly Determine the Claimant's Residual Functional Capacity.

Harlston next argues that the ALJ erred in making his RFC determination by failing to properly factor in his moderate mental limitations, bilateral knee condition, obesity, and use of a cane. The Commissioner contends that the RFC accommodates these factors in his determination that Harlston would be off task for approximately five percent of the workday. Considering the above finding that medical opinions were improperly weighed, we agree with claimant that the RFC was not properly determined. In light of our decision to remand, we comment only briefly on the current RFC assessment.

The RFC is the most a claimant can still do despite her limitations. 20 C.F.R. § 416.945(a)(1). In making the RFC determination, the ALJ will consider all of the relevant medical and other evidence in the record, including evidence of impairments that are not severe. 20 C.F.R. § 416.945(a)(3); *Craft*, 539 F.3d at

676.  The RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion.  SSR 96-8p, 1996 WL 374184, at **5, 7; *accord Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  A court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review."  *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (*citing Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)).  "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence."  *Arnett*, 676 F.3d at 592.

As discussed above, the record does not indicate that Harlston received treatment for any mental impairment.  Therefore, the ALJ's concerns regarding the severity of Harlston's alleged mental limitations have some merit.  Nonetheless, the ALJ has the sole responsibility for evaluating a claimant's RFC based on the record as a whole.  20 C.F.R. §§ 404.1546(c), 416.946(c).  The record in this case includes assessments of Dr. Fine and Dr. Boyenga.  The Commissioner argues that the ALJ considered the entirety of the evidence and accommodated complaints of memory difficulty and learning disability by noting the five percent off task time.  This explanation, however, is provided numerous times in defense of the ALJ's decision to give limited weight to certain details, i.e. mental limitations and an agency consultant's inability to review the entire record.

The ALJ "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. On remand, the ALJ needs to provide a more logical tie to why five percent is the appropriate accommodation given the claimant's limitations. The five percent off task time was never discussed by any of claimant's treating physicians or state consultants. Instead, the accommodation appears to be an arbitrary figure provided by the ALJ as a means of avoiding factoring in certain restrictions, including mental limitations. Accordingly, the reports of Drs. Fine and Boyenga should be weighed with the other evidence and more clearly addressed in the RFC.

We next turn to Harlston's claims that the ALJ erred by not finding his knee condition medically determinable and severe, and by failing to account for his knee condition, obesity, and use of a cane in his RFC finding. The Commissioner claims that the ALJ accounted for Harlston's credible impairments, including obesity and knee impairments, when limiting Harlston to a range of light work. Further, the Commissioner notes the ALJ's explanation that Harlston had the ability to ambulate effectively despite his obesity and knee impairments. *See Schmidt v. Astrue*, 496 F.3d 833, 845-46 (7th Cir. 2007) (ALJ need only include in the RFC those limitations the record supports). The ALJ also considered that the VE testified that Harlston's use of a cane for ambulation would not preclude him from employment. (R. 72.)

Accordingly, this Court finds that the ALJ properly assessed Harlston's obesity and cane usage when he considered that Harlston was still able to ambulate effectively and that the use of a cane would not affect his employment

opportunities under the RFC assessment.  Nonetheless, the ALJ should consider all factors discussed in the medical records, including obesity and cane usage, when reassessing Harlston's RFC.

### E.  The ALJ's Credibility Determination is Not Supported by Substantial Evidence.

Finally, Harlston contends that the ALJ improperly assessed his credibility. The Commissioner responds that substantial evidence supports the ALJ's credibility finding.  On this point, we agree with Harlston.  Given the Court's decision to remand for the reasons discussed above, we only briefly address the credibility issues in this matter.

To succeed on the credibility ground, a claimant must overcome the highly deferential standard that we accord credibility determinations.  *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  We will reverse an ALJ's credibility determination only if the claimant can show that it was "patently wrong."  *Id.* However, although judicial review of the decisions of administrative agencies is deferential, it is not abject.  *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (quoting *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002)).  The Court cannot uphold an administrative decision that, because of contradictions or missing premises, "fails to build a logical bridge between the facts of the case and the outcome."  *Parker*, 597 F.3d at 921 (quoting *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)).

Under SSR 96-7p, "the ALJ's assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on [her] ability to function must be based on a consideration of

all the evidence in the case record." SSR 96-7p at *5; *Unger v. Barnhart*, 507 F. Supp. 2d 929, 941 (N.D. Ill. 2007). Though the ALJ went beyond providing only disfavored boilerplate language, *see Bjornson v. Astrue,* 671 F.3d 640, 644-45 (7th Cir. 2012), the additional reasons he provided for discrediting Harlston's complaints are unsupported by the record or are otherwise flawed.

The ALJ's credibility determination conflicted with the record where the ALJ failed to consider explanations offered by claimant throughout the medical records. For example, the ALJ found that Harlston failed to comply with physician's recommendations for physical therapy. The records, however, contain references to physical therapy aggravating his condition and that he was unable to afford bus fare to get to the treatment. Instead of assessing the explanations, the ALJ found them to be inconsistent and questioned claimant's credibility. The ALJ further questioned claimant's credibility because of his failure to obtain certain prescriptions even though claimant was documented as saying that he was unable to afford medication at times.

The Seventh Circuit has held that the ALJ must first consider the reasons for lack of treatment before drawing a negative inference. *Craft,* 539 F.3d at 679 (7th Cir. 2008). Courts have also determined that the inability to afford treatment constitutes a good reason for not receiving it. *See, e.g. SSR 96*-7p, 1996 WL 374186, at * 8; *Shauger v. Astrue,* 675 F.3d 690, 696 (7th Cir. 2012). The ALJ, however, never considered claimant's inability to both attend physical therapy and afford medication, instead assuming that claimant was exaggerating his conditions.

The Court acknowledges that claimant's treatment was sporadic at times, and that there is a lack of clarity regarding the reason the alleged onset date was selected. Nonetheless, claimant did seek treatment for his conditions. His physicians found his problems credible enough to prescribe various medications, refer him to a neurologist, see a pain specialist, and order a back brace and TENS unit. Further, the claimant underwent psychiatric reviews, which yielded findings of a learning disability and mental limitations. As discussed above, the ALJ failed to properly consider these findings in the claimant's RFC assessment, and there is no indication the ALJ considered mental impairments as a reason for inconsistent treatment or statements. Further, the ALJ did not investigate his credibility concerns when the claimant testified. *See Roddy v. Astrue,* 705 F.3d 631, 638-39 (7th Cir. 2013) ("The agency requires ALJs to inquire about a claimant's reasons [] for not seeking treatment."). "The ALJ 'must not draw any inferences' about a claimant's condition from [the failure to follow a treatment plan] unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft,* 539 F.3d at 679 (7th Cir. 2008) (quoting SSR 96-7p). Therefore, on remand, the ALJ should consider all factors when assessing the claimant's credibility, including his financial and mental limitations.

## III. Conclusion

For the reasons set forth above, claimant's request for reversal of the ALJ's motion and the appeals council decision is granted and the Commissioner's motion for summary judgment is denied. This case is remanded

to the Social Security Administration for further proceedings consistent with this opinion.  It is so ordered.

**ENTERED:**

Michael T. Mason

**Michael T. Mason**
**United States Magistrate Judge**

**Dated: February 29, 2016**